UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                                        :
                                                        :
  ,                                                     :
                                                        :          **MEMORANDUM**
                                    Plaintiffs,         :          **DECISION**
                                                        :
                   - against -                          :          10 Civ. 1088 (BMC)
                                                        :
  ,                                                     :
                                                        :
                                    Defendant.          :
                                                        :
                                                        :
-------------------------------------------------------- X

**COGAN, District Judge.**

This is an action under 42 U.S.C. §1983 for false arrest, excessive force, post-arrest due process violations, and related state law claims. I have granted defendants' motion for partial summary judgment in part and denied it in part. This decision sets forth the basis for that Order.

## BACKGROUND

The case arises out of a drug bust. Viewing the facts in the light most favorable to plaintiffs, two of the defendant police officers, Detective Nixon and Sergeant Vanorden, stopped plaintiff Ivan Kimbrough on a street corner in Brooklyn. The reasons for the stop are disputed, but it is undisputed that Ivan was carrying two or three bags or baggies of marijuana. Ivan took off because, according to his testimony, he did not want to spend the night in Central Booking. With the officers in pursuit, he ran home to his apartment building, where he threw the marijuana off of the roof; he then went into his apartment and hid in the closet.

By the time Nixon and Vanorden got to the door of the apartment, they had been joined by other officers, including defendant Sergeant Perez. Ivan's mother, who is former plaintiff

(she has settled) Carmen Kimbrough, and Ivan's former girlfriend, plaintiff Nastazja Friis Rasmussen, were in the apartment, had seen Ivan run in, and knew he was hiding from the pursuing police. Carmen let Vanorden and Nixon enter and Nixon went into the back bedroom, with Vanorden behind him, where they could hear Ivan breathing heavily in the closet. Either before or after entering the back bedroom, Vanorden drew his firearm. Nixon opened the closet door; Ivan raised his hands and said "I'm sorry."

Nixon grabbed Ivan and asked him sarcastically if he wanted to run anymore; he then threw Ivan on the bed, hit him with his firearm and fist, and attempted to handcuff him. At some point, Vanorden and at least one other officer, probably Perez, entered the room. At about the exact instant when Nixon managed to handcuff Ivan, Vanorden, who was by the doorway, discharged his firearm. (Plaintiffs contend he fired intentionally; defendants assert that the circumstantial evidence shows that it was an accidental discharge). Ivan's head was grazed by the bullet, but he remained conscious and the beating continued.

After the gun discharged, and with Ivan handcuffed and still being beaten, Rasmussen attempted to interpose herself between the officers and Ivan to deflect the blows that were being delivered to him. (Plaintiffs contend that Rasmussen put her arm in front of herself to protect herself from the punches; defendants claim that Rasmussen purposely hit the officers with her hands). Regardless, it is undisputed that Rasmussen's arms and hands contacted the officers' arms, shoulders, or chests in the process; she may have jumped on one of the officers (Ivan testified that she did but then attempted to retract or modify that statement). Perez or another officer threw her down and out of the way; her head hit a window sill. That officer then picked her up by the hair and threw her into the hallway. While in the hallway, Rasmussen made multiple attempts to get back into the room, but Perez prevented her from doing so.

The officers stopped beating Ivan when he threw up. At that point, Nixon came out of the bedroom and handcuffed Rasmussen on the floor, putting his knee in her back and pushing her head into the floor in the process, as she was screaming and resisting being handcuffed. Rasmussen panicked because she has claustrophobia and has some history of paralysis, of which the restraint triggered unpleasant memories. Once she was handcuffed, she was escorted first to the precinct house and then to Central Booking. She told the officers as they were taking her out of the apartment, including an officer identified only as the "officer in a baseball cap," that she or they needed to bring her diabetes medication. One of the officers responded that they could not do that because the apartment was a crime scene and nothing in it could be touched.

Rasmussen signed two medical release forms, one at the precinct house and one at Central Booking, indicating that she was diabetic but denying the need for any medical treatment. She did this because the officer in a baseball hat, who accompanied her from the scene to the precinct and then to Central Booking, had told her that if she requested medical attention, it would substantially delay her release while she was attended to, but if she did not request medical attention, she would be released that day. She did ask for medical treatment at Central Booking when it became apparent that she was not going to be released as quickly as she expected, but in light of her signed medical releases, her custodian at Central Booking did not believe her when she said she needed medical treatment.

The officer in the baseball hat did return to the apartment and retrieved some of her medication, but it was not her primary medication for her diabetes; it helped her some, but not much. She was released 46 hours after her arrest, the first 12 of which were without any medication. It took her several months of close attention to re-balance her insulin levels, during which time she suffered exhaustion and depression.

Ivan pled guilty to marijuana possession; Rasmussen was charged with assault, resisting arrest, and marijuana possession, and she accepted an adjournment in contemplation of dismissal.

## DISCUSSION

## I

Defendants first attack Rasmussen's claim for false arrest, contending that even taking her version of the melee as true, she interfered with the officers' attempt to arrest Ivan. This, defendants contend, gave the officers probable cause to arrest her for either obstruction of governmental administration (N.Y. Penal Law §195.05) ("OGA"), or harassment in the second degree (N.Y. Penal Law §240.26). Since the existence of probable cause for any crime defeats a claim for false arrest, see Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir. 2006), defendants contend that Rasmussen's false arrest claim must be dismissed. At the very least, defendants argue, Rasmussen's claim should be dismissed on qualified immunity grounds, since New York law is unclear as to whether intervening to protect a third party from excessive police force is a defense to OGA.

Plaintiffs respond that on Rasmussen's view of the facts, she did not interfere with the attempt to arrest Ivan; indeed, she did not attempt to insert herself between the officers and Ivan until after he was handcuffed on the bed. On this view, Rasmussen interfered with an unjustified beating, not an arrest, and there was no probable cause to believe that she had violated any law in doing so, not OGA, nor harassment, and not anything else.

Both parties attempt to support their positions by arguing whether state law would allow a justification defense to the various state law charges that might be brought upon a citizen's

4

intervention into a police encounter when the intervention is to prevent police use of allegedly excessive force against a third party. But that is not the issue. The existence of a defense under state law to potential state law claims does not mean that a cause of action can be maintained under §1983, because §1983 liability turns not on the ultimate determination of guilt for the alleged crime, but the existence of probable cause for the arrest. Cf. Torraco v. Port Auth., 615 F.3d 129, 139-40 (2d Cir. 2010) (existence of potential defense to state charge does not mean that arrest was subject to §1983 liability). Stated otherwise, Rasmussen might have a perfectly valid defense to her criminal prosecution for OGA, had that occurred, but that does not equate to a false arrest claim, because the false arrest claim is defeated merely by the existence of probable cause.

Defendants properly rely on Husbands ex rel. Forde v. City of New York, No. 05 Civ. 9252 , 2007 U.S. Dist. LEXIS 61042 (S.D.N.Y. April 16, 2007), to support their position. There, the sister of the suspect urged her brother to stop resisting the officers' attempt to arrest him while he was down on the ground. She moved closer to her brother as her entreaties to him became more urgent. One of the officers told her to get back and pushed her back when she did not comply. He told her twice to lie on the ground, the first of which instruction she disregarded. She was arrested and charged with OGA and disorderly conduct for first approaching her brother and then not obeying the officers' instructions, even though it was undisputed that she had only been attempting to get him to comply with police instructions. In dismissing her false arrest claim under §1983, the district court noted that under New York law, merely approaching the police, or speaking during the course of a police action, or disregarding police instructions, will support a conviction for OGA. Id. at *43-44 (citing Decker v. Campus, 981 F. Supp. 851, 858 (S.D.N.Y.1997); and People v. Tarver, 188 A.D.2d 938, 591 N.Y.S.2d 907 (3d Dept. 1992)).

In the instant case, Rasmussen's decision to physically interfere with the conduct of the police falls within the conduct recognized by these authorities as constituting OGA. Although it is true that neither <u>Husbands</u> nor those cases upon which it relied involved a justification defense, all of them, like this case, involved situations where the plaintiff was not acting with an improper motive (again, assuming Rasmussen's version of the facts), but rather, in each of their views, to assist or alleviate a situation which they believed required their intervention.

That is the point. An action for damages under §1983 cannot turn on the subjective evaluation of a plaintiff as to whether her intervention is morally or legally justified. It would allow an award of damages based on a jury's determination of the validity of her assessment. It would thereby encourage citizens to act on the basis of their own, often uninformed or incomplete knowledge of why the police are doing what they are doing, and undermine the purposes for which statutes prohibiting interference with the police exist. There is no dispute, even under Rasmussen's version of the facts, that she deliberately and physically interfered with a police operation because she considered the amount of force used to be excessive. That was not her decision to make, or, at the very least, she cannot recover money damages for false arrest based on that decision.

In this regard, it is significant that even under Rasmussen's view of the facts, her interference spanned two divisible time periods. At first, she was in the bedroom observing Ivan being beaten and attempted to physically prevent that. She was then removed, forcibly, from the bedroom. But even after her removal, she continued trying to reenter the bedroom even though Perez was physically keeping her from doing so. Even if her physical intervention while in the bedroom would not constitute probable cause for an OGA arrest, her attempt to get passed Perez and back into the bedroom certainly would.

Finally, I note that it is not as if there are not already remedies under §1983 to deter the use of excessive force by the police. The fact that Ivan's claim for excessive force will be tried to a jury in this very case demonstrates that, and the purpose of imposing liability under §1983 is not only to compensate victims of excessive police force, but to deter the police from using such force. See Wyatt v. Cole, 504 U.S. 158, 161, 112 S. Ct. 1827 (1992). If we are to trust the law to protect citizens from excessive police force, we cannot inconsistently rely on citizens to take matters into their own hands and unilaterally determine when their intervention against the police is appropriate. On the facts presented here, it is clear that Rasmussen's interference constituted probable cause for her arrest.

## II

Defendants next contend that a portion of Ivan's claim for excessive force should be dismissed. Specifically, they contend that (a) Vanorden's discharge of his firearm was clearly accidental, and an accidental discharge under these circumstances is insufficient to demonstrate excessive force; or (b) the force used to handcuff Ivan was not excessive as a matter of law. Defendants acknowledge that even if I were to grant this aspect of their motion, there would still be disputed questions of material fact as to excessive force that the jury must determine, to wit: whether the initial beating and pistol whipping that Nixon inflicted on Ivan when he was pulled out of the closet and the kicks and punches thrown at him after he was handcuffed constituted excessive force.

Plaintiffs respond on the merits as to whether the gunshot and handcuffing each present jury questions of excessive force, but I find that defendants' motion is procedurally defective on this issue. This is not a motion *in limine*; it is a motion for summary judgment. The jury will be required to determine whether excessive force was used to effectuate the arrest in the whole

context in which it happened; it will not be asked to slice it into individual pieces to determine whether any of those pieces standing alone constituted excessive force. See Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865 (1989) ("[The] proper application [of the test for reasonableness under the Fourth Amendment] requires careful attention to the facts and circumstances of each particular case . . . ."). Although Rule 56 allows a party to seek summary judgment on part of a claim, the reference to "part" is best understood as relating to either the entirety of liability, or damages, or at least a discrete element of damages. See Hamblin v. British Airways PLC, 717 F. Supp. 2d 303, 306-09 (E.D.N.Y. 2010). It does not permit elimination of particular facts from the jury's consideration.

Indeed, it is not clear what defendants are seeking as to this part of their motion, since they concede that, in some form, Ivan's excessive force claim will go to the jury. If they are asking me to preclude any witness from testifying or being asked about the gunshot or handcuffing, I would not grant that request, as it constitutes, at least, necessary background for the jury to understand what transpired, and might well relate to plaintiffs' damage claims. If defendants are asking me to preclude plaintiff from arguing to the jury that the gunshot and handcuffing constituted excessive force, that relief is best sought in a motion *in limine* prior to trial. (This is not to suggest that I would grant any such motion). If they are asking me to instruct the jury that the gunshot and handcuffing do not constitute excessive force, their request is best raised at the charging conference. In any event, I am not going to use partial summary judgment to excise facts from the jury's hearing that are necessary for it to receive a complete description of the encounter.

I recognize that some excessive force cases have engaged in the isolation of issues that defendants seek here. The Second Circuit, for example, recently did that in Tracy v. Freshwater,

623 F.3d 90 (2d Cir. 2010). There, the Court identified four alleged sequential acts as potentially raising excessive force issues: (1) striking the plaintiff with a flashlight several times; (2) jumping on the plaintiff as he attempted to flee; (3) pepper spraying the plaintiff; and (4) forcing the plaintiff to the ground despite his statements that he was in pain and unable to move.  The Court found that acts (1), (2), and (4) did not constitute excessive force as a matter of law under all of the circumstances of the case, but that the use of pepper spray raised an issue of fact as to excessiveness.

Putting aside the hesitation I have generally in dissecting any police encounter into its separate components in an excessive force case, the framework used in Tracy does not work well here, and further illustrates the basis for my concern.  In Tracy, the initial claimed instance of excessive force – hitting a suspect with a flashlight multiple times – was found not to be excessive.  Once that was so determined, then the next act, jumping on the plaintiff as he fled, was not burdened with what might already have constituted excessive force.  And when it was then determined that jumping on the suspect did not constitute excessive force either, the subsequent use of pepper spray could be considered independently.  Each sequential act was not colored with any prior use of excessive force.[1]

In the instant case, in contrast, the first thing Nixon is alleged to have done is to deliver a vicious attack with his gun, used as a bludgeon, against a passive suspect with his arms raised in full surrender mode, while the suspect was apologizing, with the attack constituting retaliation for leading the police on an exhausting chase.  Even defendants concede that if this attack in fact occurred, it would constitute excessive force.  And if excessive force was used against Ivan as

---

[1] Since the Second Circuit found in Tracy that the use of pepper spray may have been excessive, it follows from my analysis here that I would not have resolved the issue of whether the force thereafter used to handcuff plaintiff was also excessive as a matter of law.

the first encounter, it could also influence the determination of whether the force used to handcuff Ivan thereafter was excessive. Stated otherwise, the use of excessive force in greeting a suspect with a gratuitous attack might render the use of force in handcuffing a suspect excessive, even if that same force used in applying the handcuffs would not be excessive if viewed in isolation, because the additional difficulty in applying the handcuffs and the force required to do that could be the direct result of the excessive force used in attacking him. Yet a third way of approaching this case is to say that if in fact the police used excessive force in gratuitously attacking Ivan and in continuing to beat him after he was handcuffed and subdued, then it does not matter if the handcuffing itself or the gunshot constituted excessive force; the jury will already have found the police liable for excessive force.

The matter can be readily addressed through proper jury instructions and perhaps a special verdict or a general verdict with interrogatories. I decline to use partial summary judgment to present the jury with a truncated view of the encounter or to pre-determine the instruction on excessive force that it will receive.

### III

Defendants contend that Rasmussen's excessive force claim should be dismissed because considering her deliberate intervention into the encounter, the amount of force used to extract her cannot be considered unreasonable. In Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865 (1989), the Supreme Court noted a number of non-exclusive factors that can be used to determine whether an excessive force claim presented a triable issue: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect posed an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. The standard is one of "objective reasonableness." Id. at 399. In making

that assessment, I have to consider the officers' need to make "split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97. I am to view the situation "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396. In addition, many courts have accepted the common-sense notion that in considering whether force is excessive, one other factor to consider is the severity of any injuries that the plaintiff has sustained. See Evans v. Solomon, 681 F. Supp. 2d 233, 252 (E.D.N.Y. 2010); Garcia v. Greco, No. 05 Civ. 9587, 2010 U.S. Dist. LEXIS 11106, at *18 (S.D.N.Y. Feb. 9, 2010); Phelps v. Szubinski, 577 F. Supp. 2d 650, 663 (E.D.N.Y. 2008); Bradley v. Village of Greenwood Lake, 376 F. Supp. 2d 528, 535 n.4 (S.D.N.Y. 2005).

The parties again break down the excessive force claim into separate components, or at least time periods during which force was used: (a) Rasmussen's removal from the room; and (b) her handcuffing. These intervals, neither singly nor together, constitute excessive force under the Graham factors.

Looking at the severity of the situation, it is undisputed that Rasmussen attempted to interpose herself between the officers and Ivan immediately after Vanorden (accidentally or intentionally) discharged his gun in a small room. As Rasmussen herself described, at that point, "everything was just a big mess." Even assuming that she was trying to prevent Ivan's beating, not his legitimate subjugation, her intervention increased the safety risk to everyone involved by introducing yet another person into an escalating brawl. Further, Rasmussen's subjective motive for interfering with the officers is irrelevant. See Tracy, 623 F.3d at 97. With that in mind, I find it telling that when Rasmussen was asked why she thought one police officer had told another to get her out of the bedroom, she testified, "Because probably I was interfering with

what they was [*sic*] doing." This interference, regardless of the degree or the motive, made it reasonable for the officers to remove her from the situation.

Plaintiffs argue that Rasmussen was not engaged in any illegal conduct at the time because the officers had already effectuated Ivan's arrest and were in the process of unlawfully beating him; therefore, they suggest that the officers were not permitted to use any force against her. As an initial matter, I have already determined that the officers had probable cause to arrest Rasmussen for OGA, so I reject the basic premise of this argument. In any event, even assuming there was no probable cause to arrest Rasmussen at the time, Graham does not permit me to isolate and then dissect Rasmussen's discrete foray into the brawl in the way urged by plaintiffs. Rather, I must pay "careful attention to the facts and circumstances" of the incident and determine whether, in light of the totality of the circumstances, the officers acted reasonably. Graham, 490 U.S. at 396, 109 S. Ct. 1865; see also Tennessee v. Garner, 471 U.S. 1, 8-9, 105 S. Ct. 1694 (1985).

There is no doubt that they did. When Rasmussen interfered with the officers, they were in the middle of a police operation that had already involved a hot-pursuit chase and gun fire, accidental or not. Their physical altercation with Ivan, even if it turns out to have been tortious, does not automatically make the entire incident any less of a police operation. In hindsight, a jury might look back from the safety of the courtroom and determine that it would have been preferable for the officers to have treated Rasmussen differently. But that does not mean that the officers should be held liable under §1983 for removing her from the room by force. In this regard, it is important to remember that this was not a situation where a passive bystander or arrestee was idly standing by when she was met with gratuitous police force. Rasmussen put

herself into a violent situation, and any reasonable officer on the scene would have used force to remove her from it.

Plaintiffs also stress Rasmussen's height and weight in an attempt to demonstrate the excessiveness of the force used to remove her from the bedroom. The officers were, however, obviously in no position to formulate an equation taking into account Rasmussen's body mass and the muscular force necessary to expel her from the room; they simply got her out of the way. Perhaps the officers could have picked Rasmussen up and carried her, grabbed her arm and escorted her, thrown her by her shirt rather than her hair, or taken any number of other feasible, less forceful actions that might have just as effectively achieved their desired result. That is not for me to say. As the Supreme Court directed in <u>Graham</u>, it is not my role to second guess these types of split-second decisions. Rasmussen testified that approximately 10 seconds passed from when the gun was discharged to when she was thrown from the room. Taking into account the chaos of the situation, there is no indication that Rasmussen's removal was excessively forceful, and her lack of any injury beyond bumps and bruises suggests that it was not.[2]

With regard to Rasmussen's handcuffing, plaintiffs mischaracterize the record by denying that Rasmussen was resisting arrest. This was not a suspect lying prone and following police directions. Down on the floor, with an officer on her back, Rasmussen was continually raising her head and protesting her arrest; she described herself as being in a "panic", and the panic was "even more" pronounced because of her claustrophobia. Indeed, Rasmussen admitted that "of course I was trying to resist the handcuffs a little." But "a little" has no meaning in this context, as an officer does not have to wait for a suspect to escalate resistance to a dangerous

---

[2] Plaintiffs emphasize that the force was sufficient to pull out Rasmussen's "hair extensions." They have not told me enough about this process to draw any conclusions, but my understanding is that some form of glue is used to secure the extensions. The fact that the glue gave out does not mean that the force used was excessive.

level before using what then would require a higher level of force to subdue the suspect.  Finally, the lack of any injury again indicates that the force used was not so severe as to be excessive.[3]

Numerous cases have dismissed claims of excessive force under Graham which appear to involve far more aggressive conduct than that used here.  See Hardy v. Plante, No. 06 Civ. 687, 2009 U.S. Dist. LEXIS 7779, at *5-6, *18-20 (N.D.N.Y. Feb. 3, 2009); Rivera v. City of Yonkers, 470 F. Supp. 2d 402, 405, 407 (S.D.N.Y. 2007); United States ex rel. Thompson v. Spring Valley, No. 05 Civ. 2005, 2006 U.S. Dist. LEXIS 46356, at *13-14 (S.D.N.Y. July 10, 2006); Bradley, 376 F. Supp. 2d at 535; Jackson v. City of New York, No. 01 Civ. 10116, 2005 U.S. Dist. LEXIS 12986, at *3, *12 (S.D.N.Y. June 29, 2005).  Comparing those cases to the instant case, no reasonable view of the facts would support Rasmussen's excessive force claim.

## IV

Defendants next claim is that no reasonable jury could find that the defendant City is liable under the standard set forth in Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S. Ct. 2018 (1978).  The particular "custom" about which plaintiffs complain is difficult to discern from their pleading and not much more clearly stated in opposing defendants' motion.  It appears to be plaintiffs' theory that the City "purposely ignores violations of individuals' constitutional rights." They refine this a bit further, saying that it is the custom and practice of the City to take "no action against its police officers when they violate an individual's rights.  In other words, NYC rubber-stamps all complaints against its officers as unsubstantiated and almost never requires any training or supervision as a result of a complaint."

---

[3] Plaintiff claims to have a "small scar" on her leg, but she does not recall anything specific that happened during the encounter that would have caused the scar; she attributes it to the incident because she cannot think of anyplace else she would have obtained it.  Neither side has told me how small this small scar is, but it does not sound at all serious.

When a plaintiff tries to fall within <u>Monell</u> by defining the alleged "custom or policy" as broadly as plaintiffs have here, he takes an almost impossible burden upon himself.  It is one thing to assert, for example, that a municipality is training its officers to use a particular choke-hold that carries a high risk of asphyxiation not used by other municipalities, or that senior management is failing to train its officers to refrain from using that choke-hold even though they know their officers are frequently using it.  It is quite another matter to allege broadly that as a general practice, a municipality fails to give "adequate" remedial training for officers' violations of the full panoply of constitutional rights, for which the appropriate remedial action might vary infinitely with the distinct facts of any police encounter.

The facts upon which plaintiffs rely upon here show the difficulty of the undertaking that plaintiffs have assumed.  Plaintiffs would have the jury find the existence of the City's alleged custom of not taking sufficient remedial action to remedy constitutional violations based on the following:

- A Sergeant and a Lieutenant in a Brooklyn South unit that investigates police misconduct are unaware of any substantiated incidents of excessive force in the five and ten years, respectively, that they have been in this unit;

- A Sergeant in the Internal Affairs Division who has investigated eight incidents in the last two years has not found any to be substantiated;

- In the past five years, Vanorden has had seven unsubstantiated complaints involving use of force, veracity, or both, and in the past 10 years, he has been named in seven §1983 cases.  He has received (1) 2-3 days of sensitivity training; and (2) as a result of the discharge of his weapon in this case, he attended one day of additional training at the shooting range.  Vanorden testified that he did not learn anything additional in this training;

- In the past five years, defendant Officer Mahoney has received eleven complaints involving use of force, veracity, or both, and has been named as a party in seven §1983 cases.  He has received no special monitoring as a result of these complaints.  He is not concerned about them because he does not see that he has any financial exposure.

I do not see how I could uphold a jury finding that the City has a "custom" of ignoring the violation of constitutional rights under these facts.

The problem is that none of these facts show that there has been *any* violation of constitutional rights, so there is no evidence of the predicate fact underlying the alleged custom and policy. Plaintiffs seem to proceed on the assumption that if a complaint, whether administrative or by way of a civil action, is filed against an officer, it follows *ipso facto* that he is guilty of a constitutional violation, a proposition I cannot accept. Alternatively, to the extent plaintiffs are alleging that the absence of substantiation as to these incidents necessarily means that the CCRB and the Courts give no serious consideration to complaints against the police, but merely, to use plaintiffs' term, "rubber stamp" their denial, that inference would also depend on the assumption that what seems, to me at least, the relatively small sample of incidents that plaintiffs offer necessarily include some undefined number of actual, but unproven, constitutional violations, and that the sample plaintiffs have selected is fairly representative of the system as a whole. But it is one thing to assume the facts *in this case* most favorably to plaintiffs on a summary judgment motion; it is quite another to assume every other unsubstantiated complaint on which they rely in fact entailed a constitutional violation, and to further assume that this is a representative sample.

I cannot ask a jury to engage in speculation based on plaintiffs' assumptions. Those assumptions are fatally undercut by the fact that some CCRB complaints are found to be substantiated (I have had §1983 cases before me where that was the case) and by plaintiffs' failure to offer some way for a jury to determine whether the relatively small number of incidents to which they refer, even if constitutional violations occurred but were not found, are representative of an overall pattern of deliberate neglect, rather than simply outliers. The

assumptions are also undercut because they do not recognize that policing necessarily involves confrontation with people in an upset state of mind, and it is to be expected that some number of CCRB complaints that do not in fact amount to constitutional violations are highly likely to be filed; indeed, it cannot be seriously disputed that even with regard to the many §1983 complaints involving police conduct filed in federal court, some number have no merit at all.[4]

This very case proves the point. To prove their alleged policy and practice, plaintiffs rely, in part, on the fact that defendant Officer Mahoney has received 11 unsubstantiated administrative complaints and has been named in seven §1983 cases. This tends to show, in part, according to plaintiffs, that the City does not provide adequate remedial training for or apply disciplinary measures to its officers. But when it came time to oppose defendants' motion for summary judgment in the instant case, plaintiffs, without any fanfare, noted that they were voluntarily dismissing Officer Mahoney, presumably because they now realize he did not do anything wrong. Thus, plaintiffs' own decision to sue him and then withdraw their claim shows that no assumption of culpability can be drawn from the mere fact that unsubstantiated complaints against a police officer are made. I have no reason to believe that the other complaints against him are any different than this one.

Finally, plaintiffs' Monell claim fails because they cannot show that any injuries plaintiffs received were caused by the alleged custom or practice. At the very least, they had to

---

[4] Plaintiffs may contend (although they have not) that they attempted to get broader Monell discovery that might have supported their claim but the Court imposed limitations on that discovery. The desirability of any limitations that the Court imposed is well demonstrated by the sampling upon which plaintiffs rely – to prove that the eight IAB incidents, 18 unsubstantiated CCRB complaints, and 14 §1983 cases involved actual constitutional violations would require discovery and likely a mini-trial as to each of those incidents to almost the same extent as in the instant case. The costs of that discovery for the City in every case would bring it to its financial knees with no reason to believe that the discovery would assist any plaintiffs' theory. Plaintiffs' problem is not a lack of discovery or proof; it is the unsustainable overbreadth of their Monell theory. This is not to say that there is no way that a plaintiff could ever prove a Monell claim on a theory as broad as that advanced here. It is not my place to tell plaintiffs how to prove their case, but it seems to me that there are ways; they just require a more focused effort than plaintiffs have undertaken here.

show some evidence that the failure of the City to take certain actions contributed to the incident here. Again, if one accepts plaintiffs' assumptions – that repeated instances of constitutional violations by police officers carry no consequences – a factual issue might exist as to whether the lack of consequences contributed to this incident. But since the assumptions fail for lack of proof, plaintiffs' causation argument does too.

<h1 style="text-align:center">V</h1>

Rasmussen claims that after her arrest, some defendants were deliberately indifferent to her medical condition and therefore violated her right to due process of law. Defendants contend that no reasonable jury could reach such a determination based on the acts of which Rasmussen complains.

In order to make out her claim, Rasmussen must show that she suffered from a serious medical condition and that her condition was met with deliberate indifference. See Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009). Rasmussen does not need to prove that the police officers involved had any malicious intent to injure her or cause her to suffer. If a police officer consciously disregarded a known medical condition that risked inflicting serious harm on her, that would violate her due process rights. However, mere negligence is not sufficient. There has to be an awareness of the condition and a general knowledge that Rasmussen was at risk, which the officer then made a choice to disregard, knowingly or recklessly putting her in peril. See Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996). Here, we will assume for purposes of this motion that several of the officers involved were aware of Rasmussen's condition because she told them of it and requested her medication as she was being escorted from the apartment. There can also be no question that diabetes can be a potentially serious condition from any objective viewpoint. See Beatty v. Davidson, 713 F. Supp. 2d 167, 174 (W.D.N.Y. 2010).

In analyzing this claim, it is important to note that it is not a <u>Monell</u> or vicarious liability claim against the City.  That is, Rasmussen must assert her deliberate indifference claim – or, more properly, as she has presented the case, claims – against specific, individual police officers for violating her due process rights. This is because she does not allege that her rights were violated pursuant to a conspiracy or some form of coordinated collective action; each of the officers who deprived her of medical attention, she alleges, engaged in an independent act of deliberate disregard concerning her medical needs. Thus, if Rasmussen was successful before a jury on this claim, the jury would find a named police officer or officers liable, and it would award damages against that officer or officers. Rasmussen would have the right, if the judgment was not quickly satisfied, to execute her judgment on the personal assets of each judgment debtor officer. This result follows from the basic principle that a police officer cannot be liable for a constitutional violation unless he personally commits or fails to prevent the constitutional violation.  <u>See</u> <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994).

Rasmussen does not seem to recognize this.  The approach taken in plaintiffs' brief is to combine the separate events indicative of the need for medical treatment and then assert that an issue of fact exists on her due process claim – against *everybody*.  Although her brief goes through the separate acts that each officer, named or, mostly, unnamed, committed, it pools their actions to assert that the pattern of events itself constitutes a single deliberate indifference claim. The idea appears to be that if the events are viewed collectively, even though they are not the product of concerted action, then while no one event may constitute deliberate indifference, the sum may become greater than its parts.

Breaking down Rasmussen's due process claim into its component parts, the claim involves three groups of officers: (1) the arresting officers, including the officer in the baseball

hat, other than Vanorden and Nixon, who she told she needed her medication but one of them (perhaps the officer in the baseball hat, perhaps another of the officers) told her she could not have it immediately because they could not disturb the crime scene; (2) the officer in the baseball hat, who was "very, very nice" to Rasmussen, counseling her to sign a medical waiver form so that she could be released faster, and then going to retrieve her medication from her apartment when she was not released faster; and (3) an unidentified female corrections officer in Central Booking who declined Rasmussen's two requests to see a doctor because Rasmussen had signed a medical waiver form.

The individual liability of particular defendants that must underlie Rasmussen's due process claim results in two insurmountable problems. First, despite discovery, she has not identified most of the officers who allegedly violated her rights. I cannot enter a judgment against an "officer in a baseball hat," nor, of course, could Rasmussen locate any of his assets upon which to execute a judgment.[5] The same is true of the "unidentified female correction officer" at Central Booking who rejected Rasmussen's requests for medical treatment in light of her signature on the forms disclaiming the need for medical treatment.

It is one thing to identify by name three officers who were in the room and sue them despite not knowing which ones undertook to beat a plaintiff and which ones failed to prevent the beating. See Shankle v. Andreone, No. 06 Civ. 487, 2009 U.S. Dist. LEXIS 88293, at *15-17 (E.D.N.Y. Sept. 25, 2009). At least the plaintiff in that situation knows who all of the police officers are. They are all potentially liable and a jury can sort out their respective roles if it

---

[5] Plaintiffs assert in their brief that defendants Officer Carrero, who is deceased, and Sergeant Perez were the ones who advised Rasmussen to sign the medical release forms, but I see no evidence of that in the record. Rasmussen referred only to "an officer in a baseball hat." If the officer in the baseball hat was one of the defendants, it could have been easily been determined either by having Rasmussen briefly attend Perez' deposition or by having her view photographs of both defendants.

accepts the plaintiff's story.  It is another matter entirely to maintain a suit against officers on a

"John Doe" basis, or even to sue some by name and then assert claims against unnamed

defendants, and expect to receive a verdict and judgment against the named officers based on

what John Doe allegedly did.  I do not know why Rasmussen did not obtain this identification

information in discovery, but she offers no theory as to how she could overcome this practical

problem.  Rasmussen cannot predicate claims against named defendants based on the acts of

unnamed defendants since there is no basis for vicarious or shared liability between them.

Aside from this problem, Rasmussen's claim is substantively deficient against those

involved, whether named or unnamed. The most serious allegation Rasmussen makes is probably

against the first category of defendants – that when she told the officers at the time of her arrest

that she needed her medication, they did not immediately bring it with her when they took her to

the precinct.  That may or may not have been less than good judgment on their part, but there is

no indication that it rises to the level of deliberate indifference.  She does not contend that she

was at that point demonstrating any physical distress other than the anxiety attendant to her

arrest.  She has offered no evidence, lay or expert, that it is standard police procedure to

immediately secure diabetes medication upon a suspect's arrest, and while such evidence is not

required, the violation of a basic safety procedure, if it is indeed basic, could support an

inference of deliberate indifference.[6]  Indeed, as discussed more fully below, there can be no

obligation on the part of police to allow an arrestee to take whatever medication the arrestee says

they need with them to the police station; if medical attention is needed, the obligation of the

---

[6] In any event, the arresting officers would, at the very least, be entitled to qualified immunity.  There is simply no
way for me to conclude that the arresting officers violated Rasmussen's clearly established constitutional right to
due process when they failed to secure her medication at the point of the arrest.  See, e.g., Harlow v. Fitzgerald, 457
U.S. 800, 818, 102 S. Ct. 2727 (1982).

police is only to bring in medical personnel to have the arrestee evaluated and make that evaluation from a medical perspective.

With regard to the officer in the baseball hat, there is a problem beyond his anonymity. His alleged wrongful act was counseling Rasmussen to sign medical waiver forms with the assurance that she would be released shortly, when in fact she was held for nearly two days. But it is not as if Rasmussen is alleging that he purposefully misled her to deprive her of her medication. There is no reasonable view of the facts as alleged by Rasmussen except that the officer actually believed she would be released quickly, or at least more quickly, if she did not demand medical attention for which she would have to wait. He might have made a mistake in thinking that, or in the timetable for release without medical attention, but what he did thereafter shows that his attitude was the opposite of deliberate indifference – when her release took longer than he had expected, he went to get her medication. Although he retrieved the wrong medication, that too was obviously a mere mistake; the effort itself, combined with the absence of any evidence to show deliberate indifference when he accompanied her from the apartment initially, defeats Rasmussen's due process claim against him.

Rasmussen's own admissions are contrary to any claim of deliberate indifference by this officer – she described him in her testimony as "very, very kind."[7] Rasmussen's attorneys characterize this officer as having brought "pressure and influence" on her to induce her to sign the medical waivers, implying, without any logical basis that I can see, that he might either have been doing so maliciously or perhaps because he might receive some unknown benefit, but no

_____

[7] Rasmussen testified: "I was kind of shocked when he told me I was going to [Central] Booking[] and he told me that I will get out that same night because he was pretty nice. I have to admit even though he was involved in the whole thing, he was being very, very kind to me." She also testified that, "because he knew I was taking a risk by [signing the waiver forms], he kept telling me, 'Just in case you start feeling sick during the day, make sure you tell somebody that so they can get you treatment.'" This is not deliberate indifference.

reasonable jury could view her deposition testimony that way; it is a characterization that her testimony simply does not support.

I suppose it is theoretically possible for a police officer to be both "very, very kind" and deliberately indifferent at the same time, but this inherent inconsistency emerges only as a result of counsel's argument, not any evidence. The conclusion on this record is inescapable that Rasmussen signed the waiver forms because she wanted to be released more quickly, and the officer in the baseball hat advised her to sign them because he too wanted her to be released more quickly. They were both mistaken, he in his advice and her in acceptance of it, but that is not deliberate indifference. And again, even if he was deliberately indifferent, the parties to this action are not vicariously liable for this unnamed officer's acts and omissions.

The theory against the unidentified female corrections officer in Central Booking suffers from the same problem as that involving the officer in the baseball hat – whoever she is, she does not appear to be a party to this action. I can see no party in this case who could be vicariously responsible for her actions, and thus the fact that she denied Rasmussen medical treatment cannot result in liability against the parties who are in fact present in this lawsuit.

Finally, in evaluating the response of the police officers to Rasmussen's medical needs from their subjective perspective, see Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996), plaintiff's own attitude and conduct needs to be taken into account, as it is that to which the officers were responding. Here, Rasmussen not only signed the two release forms – based on a mistaken belief of earlier release, but signed nevertheless – but her testimony clearly indicates that the last thing she wanted to happen was to be taken to a hospital and medically evaluated, as that would delay her release. In fact, she saw at least one medical professional in processing her paperwork, but was neither examined nor referred because she did not take the opportunity to tell

the doctor or nurse that she needed diabetes medication; she was too interested, albeit understandably, in getting released.

In this regard, it must be emphasized that the police had no obligation to take Rasmussen's word that she needed her medication and to give it to her. The obligation of the police to provide necessary medical treatment upon request by a detainee or based upon the obvious need for treatment is satisfied when the police summon medical assistance; they have no duty to provide that assistance themselves, even in situations far more extreme than Rasmussen's. Cf. Rich v. Mayfield, 955 F.2d 1092 (6th Cir. 1992) (officers discovering detainee hanging in suicide attempt had no obligation to cut him down; summoning paramedics promptly was sufficient); Tagstrom v. Enockson, 857 F.2d 502 (8th Cir. 1988) (after suspect crashed in high speed chase, police officer had no affirmative duty to render medical assistance; calling for paramedics was sufficient); Price v. County of San Diego, 990 F. Supp. 1230 (S.D. Cal. 1998) (police had duty to call for assistance, not render CPR, when they saw detainee turning blue).

Although police have to be allowed some discretion, when a detainee in a drug scene arrest claims the need for medication, the police should not be obligated to evaluate the credibility of the detainee, and then play doctor to accommodate that asserted need by deciding to let the detainee self-medicate. The detainee's due process right is to necessary medical *diagnosis* and *treatment*; it is not to be supplied by the police with drugs of the detainee's choosing. The officer, after all, has no way to know with certainty whether the detainee really needs the medication, what the medication really is, or whether the medication could be dangerous or abused. Indeed, when the officer in the baseball hat took it upon himself to help Rasmussen by trying to retrieve medication from her apartment, he was taking some risk to himself and potentially to her health, albeit for beneficent purposes.

Thus, the only action the police are obligated to take upon a detainee's assertion of medical needs is not to fetch the detainee's claimed medication, but to obtain the intervention of a qualified medical professional as quickly as the detainee appears to need it, so that the professional can decide what to do. This, Rasmussen emphatically did not want. Her own testimony was that she did not want the police to take her to the hospital and she did not in fact go to the hospital once she was released two days later. Her testimony was clear that she believed that she did not need the evaluation because she felt she could handle her condition on her own, and indeed, despite her current claims that she suffered for several months after her release in stabilizing her blood sugar, she chose not to see a doctor concerning her issues until six months after her release.[8] The police were thus faced with a detainee who did not want to see a doctor, and yet bringing her to see a doctor was the only proper action that the police could have taken. Given this scenario, defendants in this case cannot be said to have acted with reckless indifference. At the very least, the facts here compel the conclusion that the officers would be protected by qualified immunity.

## VI

In plaintiffs' amended complaint, Rasmussen alleged that defendants had subjected her to intentional infliction of emotional distress by beating and shooting Ivan in front of her. Now that defendants have challenged that theory in their motion for summary judgment, Rasmussen has advanced an entirely different theory – that defendants' alleged denial of medical treatment to Rasmussen constituted intentional infliction of emotional distress. Rasmussen is not entitled to assert an entirely new theory of claim in opposition to a motion for summary judgment. <u>See</u>

---

[8] Rasmussen testified that when she was released, "I felt I knew more about my own condition than another doctor. . . . I did not want to go sit in a hospital for, I don't know how many hours, so I was just trying to get [my blood sugar] down by myself . . . . So basically I don't believe in hospitals."

Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001); Jackson v. Onondaga County, 549 F. Supp. 2d 204, 219-20 (N.D.N.Y. 2008); Smith v. P.O. Canine Dog Chas, Shield No. 170, No. 02 Civ. 6240, 2004 U.S. Dist. LEXIS 19623, at *38 (S.D.N.Y. Sept. 28, 2004) (collecting cases).

Even if the Court considered the new claim, it fails for the same reasons as Rasmussen's medical treatment due process claims. The facts in this record simply will not support a conclusion that defendants intended to cause or recklessly disregarded the substantial probability of causing severe emotional distress. See Stuto v. Fleishman, 164 F.3d 820, 827-29 (2d Cir. 1999). In addition, Rasmussen has the same inability to identify any particular defendant for her intentional infliction claim that she has with her medical treatment due process claim. Finally, an intentional infliction claim is a gap-filling cause of action meant to address those few areas of outrageous anti-social behavior not addressed under any other cause of action. See Moore v. City of New York, 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002). The fact that Rasmussen cannot prevail on her medical treatment due process claim does not permit her to advance an intentional infliction claim for the purposes of curing her deficiencies under an already recognized cause of action. See id.; Fischer v. Maloney, 43 N.Y.2d 553, 557-58, 402 N.Y.S.2d 991, 992-93 (1978).

## CONCLUSION

Defendants' motion for partial summary judgment is granted except as to Ivan's claims of excessive force.  Defendant Officer Mahoney is dismissed on consent.  The matter shall proceed to trial on the remaining claims as previously scheduled.[9]

**SO ORDERED.**

<u>Signed electronically/</u>Brian M. Cogan

U.S.D.J.

Dated: Brooklyn, New York
       February 2, 2011

---

[9] Defendants also challenge many of plaintiffs' theories on qualified immunity grounds, some instances of which have been mentioned above.  Qualified immunity requires a two step inquiry, in either order, one step of which is the determination of whether issues exists that a plaintiff's constitutional rights have been violated.  <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. 223, 129 S. Ct. 808, 816 (2009); <u>Tracy</u>, 623 F.3d at 97.   To the extent the Court has found above that no constitutional violations have occurred, it follows that the officers are also protected by qualified immunity.